Filed 2/9/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| GARDENA HOSPITAL, L.P.,<br><br>        Plaintiff and Appellant,<br><br>    v.<br><br>MICHELLE BAASS, as Director, etc., et al.,<br><br>        Defendants and<br>Respondents. | B316529<br><br>Los Angeles County<br>Super. Ct. No. 20STCP02501 |

        APPEAL from an order of the Superior Court of Los Angeles County, James C. Chalfant, Judge.  Affirmed.
        Athene Law, Long X. Do, Felicia Y. Sze, and Kyle R. Brierly for Plaintiff and Appellant.
        Rob Bonta, Attorney General, Cheryl L. Feiner, Senior Assistant Attorney General, Gregory D. Brown and Benjamin G. Diehl, Supervising Deputy Attorneys General, and Michael E. Byerts, Deputy Attorney General for Defendant and Respondent.

_____

        Two state manuals guide health care facility accounting. Both set out principles for counting patient days, but only one

says anything specific about how to count "bed holds" when calculating Medi-Cal reimbursement.  We affirm because the trial court was right to rule the specific manual governed.

I

State regulatory authorities classify medical care into categories like "Acute Care" (which includes, for example, coronary care and burn care) and "Long-Term Care" (which includes subacute care and skilled nursing care).

Appellant Gardena Hospital offers general acute care, and also houses a separate 69-bed area where skilled nurses provide subacute care.  The hospital furnishes long-term care in its subacute area.

The hospital cares for Medi-Cal patients, and the respondent state has agreed to reimburse the hospital for that care.  The state determines how much to pay based on data the hospital supplies it.

The controversy turns on the proper way for the hospital to report its data.  These data drive a reimbursement formula.  If the hospital reports fewer patient days, it gets a larger per diem from the state, because the governing formula divides costs by patient days.  The hospital wants a larger per diem.  The state does not.

The data disagreement is over bed holds.

A bed hold is a day when a patient is not in the hospital's subacute section but is expected to return in the near future.  During a bed hold day, the patient's long-term bed remains empty because the facility is saving it for the patient's return.

Suppose you are in a long-term care facility.  But then an accident or another unwelcome event forces you to leave, temporarily, for more intensive but short-term medical treatment

2

available only elsewhere: you must go to the hospital. What if, in your temporary absence, your long-term facility gives away your bed to someone else whose needs are also pressing? You might want a guarantee that, when your temporary treatment is complete, you can return to the same long-term facility.

State bed hold regulations respond to this kind of situation. They entitle patients to a seven-day bed hold under some circumstances. (Cal. Code Regs., tit. 22, § 72520, subd. (a).)

The hospital lowered its reported patient days by *excluding* bed hold days from reported patient days. The government conducted its yearly audit and told the hospital it must *include* those days. The state's change would reduce reimbursement to the hospital by about $160,000 annually.

The hospital unsuccessfully appealed this point, first informally and then, separately, as a formal matter. Next the hospital sought a writ of mandate from the superior court. The trial court issued a thoughtful and comprehensive 31-page single-spaced ruling in the state's favor. We affirm.

## II

The specific controls the general. That was the crux of the trial court's decision. We affirm this venerable principle. (See *Sieg v. Fogt* (2020) 55 Cal.App.5th 77, 88 [independent review of legal questions].)

## A

The hospital wants to exclude bed holds. To justify this exclusion, the hospital points to a state manual titled the Accounting and Reporting Manual for California Hospitals, which everyone in the case calls the "Hospital Manual." "This Manual is the foundation for uniform accounting and reporting for

3

hospitals within the State." (Hospital Manual, Preface, section 1001 (July 2003) <https://hcai.ca.gov/wp-content/uploads/2020/10/Chpt1000.pdf> [as of February 8, 2024], archived at <https://perma.cc/YQE5-MZ95>.)

The Hospital Manual lists generally accepted accounting principles in Chapter 1000, and then in Chapter 2000 includes a "System of Accounts" for various medical activities, such as "MEDICAL/SURGICAL ACUTE," "PEDIATRIC ACUTE," and "PSYCHIATRIC ACUTE - ADULT," addressed in separate sections. Following these is a different section devoted to "SUB-ACUTE CARE." (Hospital Manual at chapter 2000 (July 2003) <https://hcai.ca.gov/wp-content/uploads/2020/10/Chpt2000.pdf> [as of February 8, 2024], archived at <https://perma.cc/85CM-QLY6>.)

This section continues with a heading entitled "Standard Unit of Measure: Number of Patient (Census) Days." Under that heading are these words (to which we add italics) that the hospital says are controlling: "Report patient (census) days of care for all adult patients *provided* sub-acute care." (*Ibid.*)

The Hospital Manual does not refer specifically to bed holds, here or elsewhere.

The hospital's logic is that it is not *providing* care to anyone during a bed hold. That bed is empty: there is no patient to receive care. So therefore, the hospital reasons, it must exclude bed holds from reports to the state.

This argument is logical at some level, but the fact remains that the Hospital Manual never specifically refers to bed holds.

The state, on the other hand, points to a second manual: the Accounting and Reporting Manual for California Long-Term Care Facilities, commonly called the "Long-Term Manual." This

4

manual *specifically* states bed hold days should be *included* in total patient days.  We italicize key words:

"Bed-hold and Leave of Absence Revenue - Skilled nursing facilities may be paid for bed-hold or leave days, which are for specific patients on a short leave from the facilities.  *Each bed-hold or leave day is to be counted as a patient day* ...."

This section, located in Chapter 3000 of the Long-Term Manual (<https://hcai.ca.gov/wp-content/uploads/2020/10/Chpt3000-1.pdf> [as of February 8, 2024], archived at <https://perma.cc/3Y3E-VE6T>), includes 200 more words about the proper accounting, reporting, and revenue treatment of bed holds.  We need not quote or belabor these additional words.  The point is that the Long-Term Manual *specifically* addresses the issue of bed holds, and does so at length.

The trial court correctly concluded the specific provision controlled the general one.

B

In 1843, Jeremy Bentham explained the specific/general principle, with our italics.  "If there should be any particular provision that appears at first sight to be repugnant to one more general, they should, if possible, be reconciled:  if not, *let the particular provision prevail over the general*.  For this reason,— the particular provision is established upon *a nearer and more exact view of the subject than the general, of which it may be regarded as a correction*."  (Bentham, *General View of a Complete Code of Laws*, in The Works of Jeremy Bentham, vol. 3 (Tait edit., 1843) <https://oll.libertyfund.org/title/bowring-the-works-of-jeremy-bentham-vol-3> [as of February 8, 2024], archived at <https://perma.cc/ZHX2-33LV>. (Bentham).)

5

Bentham's logic stated common sense, and general American law incorporates that common sense. A specific statute controls a general one, regardless of the priority of enactment, unless there is a clear intention to the contrary. (*Morton v. Mancari* (1974) 417 U.S. 535, 550–551.) The principle is that these two provisions are not actually in conflict but can exist in harmony. "The specific provision does not negate the general one entirely, but only in its application to the situation that the specific provision covers." (Scalia & Garner, Reading Law: The Interpretation of Legal Texts (2012) p. 185.)

In 1872, California law enshrined this principle in a statute. Section 1859 of our Code of Civil Procedure states that, "when a general and particular provision are inconsistent, the latter is paramount to the former. So a particular intent will control a general one that is inconsistent with it."

Case law follows this precept. (E.g., *Cumero v. Public Employment Relations Bd.* (1989) 49 Cal.3d 575, 587.)

This makes common sense. When we are concentrating on a particular detail and giving a specific instruction about it, our studied pronouncement governs more general declarations. We are paying more attention to the detail than when we are speaking generally, and our focused and considered words are more valuable and reliable. As Bentham wrote, and as we repeat for emphasis, the particular provision is *a nearer and more exact view of the subject than the general, of which it may be regarded as a correction.*

Suppose your parent advises you, "Always be on time." On some different date, that parent says, "When you are to meet with Chris Smith, show up 10 minutes late, for Chris Smith always arrives 15 minutes after the set time." These instructions

6

are not in conflict, no matter their temporal order.  The specific controls the general.  The specific *may be regarded as a correction* to the general.

The trial court was right to give decisive weight to the government manual dealing specifically with bed holds.

## C

The hospital's six appellate arguments do not overcome this old wisdom.

First, the hospital says the trial court's approach violated a regulation that, with our italics, provides:

"(k) A separate and distinct cost center shall be established and maintained in order to identify and segregate costs for adult and/or pediatric subacute patients separately from costs for other patients who may be served within the certified nursing facility.

"(1) Cost reporting for the adult subacute or pediatric subacute unit in *freestanding* certified nursing facilities shall be maintained according to generally accepted accounting principles and the uniform accounting system adopted by the State and specified in the Accounting and Reporting Manual for California *Long-Term Care* Facilities [the *Long-Term Manual*], pursuant to Section 97019, and shall be submitted in the manner approved by the State specified in the Accounting and Reporting Manual for California Long-Term Care Facilities, pursuant to Section 97019.

"(2) Cost reporting for the *adult subacute* or pediatric subacute unit *in distinct part skilled nursing units in general acute care hospitals* shall be maintained according to generally accepted accounting principles and the uniform accounting system adopted by the State and specified in the Accounting and Reporting *Manual for California Hospitals* [the *Hospital Manual*], pursuant to Section 97018, and shall be submitted in

7

the manner approved by the State specified in the Accounting and Reporting Manual for California Hospitals, pursuant to Section 97019." (Cal. Code Regs., title 22, § 51215.6(k), italics added.)

In short, the hospital argues this regulation *specifically* directs it to use the Hospital Manual and not the Long-Term Manual, and that means exclude the bed holds.

The state responds that a different regulation is controlling. The trial court agreed, finding that the hospital's skilled nursing facility provided long-term care. The trial court correctly concluded California Code of Regulations, title 22, section 97019 governed.

Section 97019, subdivision (a), states, with our emphasis:

"To assure uniformity of accounting and reporting procedures among *long-term care facilities*, the Office shall publish an "Accounting and Reporting Manual for California *Long-term Care* Facilities," [the *Long-Term Manual*,] which will be supplemental to the system adopted by this Chapter. . . . *All long-term care facilities must comply with* the systems and procedures detailed in the applicable version of *the Manual. . . .* The Manual published by the Office shall be the official and binding interpretations of accounting and reporting treatment within the long-term care facility accounting and reporting system."

We pause to note a wrinkle. Section 51215.6 is more specific than section 97019 in a sense. It refers to the very type of facility at issue here, while section 97019 applies to long-term care facilities generally. In particular, section 51215.6 applies specifically to "the adult subacute . . . unit in distinct part skilled nursing units in general acute care hospitals," which all agree is

8

what we have here, while section 97019 generally applies to "*[a]ll* long-term care facilities." But this specificity is not decisive here because only one manual mentions bed holds.

The Long-Term Manual's *extremely* specific reference to bed holds is the specificity that matters. This is the greatest degree of specificity anywhere in this regulatory landscape. The regulations we interpret refer to particular agency manuals, and one of those manuals spotlights the precise issue at hand: how to treat bed holds. In this situation, we give decisive weight to the most specific treatment of the matter.

We therefore follow section 97019's directive that long-term care facilities, like the hospital's, use the Long-Term Manual, which contains specific instructions to include bed holds in the hospital reports.

That concludes our treatment of the hospital's first argument.

Turning now to the second argument, the hospital protests this ruling would create a "hodgepodge approach of selecting provisions from both manuals" that would leave hospitals to the state's whimsical decisions about which manual governs what.

The hospital does not identify any specific uncertainties this supposed clash of manuals will produce. As presented in the hospital's opening brief, then, this fear is hypothetical. An ungrounded horrible is not a good reason to depart from the rule that the specific governs the general. Specific accounting rules must be interpreted as correcting the general ones, as Bentham suggested. The trial court ruling was correct.

Third, and in the same vein, the hospital writes that the trial court's judgment "is wrong for the additional reason that it leads to an absurd, unworkable result. [Gardena Hospital] is a

single hospital required to comply with a 'uniform accounting system' for all of its departments. The Hospital Manual is intended to 'assure uniformity of accounting and reporting procedures among California hospitals.' Cal. Code Regs., tit. 22, §97018(a). The court's decision would apply different accounting rules to different departments of the same hospital, resulting in one patient being counted as being located in two different departments of the hospital on a given day. In the absence of any explicit law or regulation warranting such an outcome, hospitals are left in the untenable position of the haphazard application of either [government] manual based on the whim of [the government authority] and its determination of what would be financially beneficial for the State. This constitutes a gross miscarriage of due process."

Correcting the general by reference to the specific, however, is neither absurd nor unworkable. Nor is it a gross miscarriage of due process. The specific provisions of the Long-Term Manual correct the uniform approach of the Hospital Manual. This approach is straightforward and workable.

Fourth, referring to email responses from a state agency, the hospital contends the trial court analysis countered the government's own interpretation of its regulations. As the trial court correctly pointed out, however, the state office sending these messages confessed it had "no authority to define the collection of data required for Medi-Cal cost reimbursement . . . ."

Fifth, the hospital maintains the trial court result is contrary "to a broad scheme of Medicaid laws and authorities." The hospital refers to general authorities, but none is more specific about bed holds than the Long-Term Manual. The trial court made this very point.

10

Sixth, the hospital identifies important policies it says support its position. Similarly, it maintains the trial court ruling will lead to "absurd results" and to "confusion." In the field of health care, however, judges for the most part are in a poor position to assess appeals to wise policy or to predict what is workable. For decades, the nation has debated how to structure and finance health care. We have learned the matter is complex and controversial. We cannot override a specific text with a judicial policy analysis about what makes for sound health care policy.

## DISPOSITION

We affirm the order and award costs to the respondent.


WILEY, J.


We concur:


STRATTON, P. J.


GRIMES, J.


11